NOT DESIGNATED FOR PUBLICATION

No. 128,467

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CORTNEY LEON ROBERSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GERALD R. KUCKELMAN, judge. Submitted without oral argument. Opinion filed July 24, 2026. Affirmed and remanded with directions.

*Merideth J. Hogan*, of Kansas Appellate Defender Office, for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before PICKERING, P.J., ISHERWOOD, J., and ANDREW M. STEIN, District Judge, assigned.

PER CURIAM:  Cortney Leon Roberson appeals the jury's finding that two of his convictions were domestic violence offenses. Roberson also appeals the sufficiency of the evidence supporting his conviction for criminal damage to property and issues with the journal entry of sentencing. Our review finds the evidence was sufficient to support the jury's finding of domestic violence offenses and Roberson's conviction of criminal damage to property. We also find that, while the district judge initially misspoke when pronouncing Roberson's sentence, the judge correctly ordered the appropriate sentence. However, the journal entry of sentencing misstates the sentence and failed to designate

1

one of the criminal threat counts as a domestic violence offense. We thus affirm Roberson's convictions but remand for a nunc pro tunc journal entry of sentencing.

FACTUAL AND PROCEDURAL BACKGROUND

Following an incident that occurred on March 8, 2024, the State charged Roberson with criminal discharge of a firearm, two counts of aggravated assault, two counts of criminal threat, and criminal damage to property. The alleged victims were Payton Jandreau and Noah Funk. The State further alleged that the counts of aggravated assault and criminal threat in which Jandreau was the victim were domestic violence offenses as defined by K.S.A. 21-5111(j). The State alleged Roberson damaged one of Jandreau's tires. The case proceeded with a two-day jury trial.

Because Roberson only challenges the sufficiency of the evidence to support finding the crimes against Jandreau were domestic violence offenses, the sufficiency of the evidence to support his conviction for criminal damage to property, and a sentencing issue, it is unnecessary to discuss all the trial evidence in detail. As a result, we do not recount the evidence supporting Roberson's convictions for criminal discharge of a firearm or the aggravated assault and criminal threat convictions in which Funk was the victim.

At trial, Jandreau testified she and Roberson "were friends for a while and we've had sexual relations in the past." They had been sexually intimate "three or four" times over a year prior to trial. Jandreau explained that they did not continue to talk thereafter, until approximately one month before the incident when Roberson reached out to her. She described the relationship between her and Roberson in March 2024 as "a little rocky."

Jandreau told the jury that, on March 7, 2024, Roberson had FaceTimed her, and she told him she would talk to him later. She never did. Roberson texted her that evening, and Jandreau told him she was with somebody and was going out.

Jandreau later saw Roberson while at The Dive, a bar in Leavenworth. Although she went to The Dive alone, Jandreau met up with some friends, including Funk. Roberson arrived later.

Jandreau left the bar about 1:45 a.m. She then returned to the bar to use the restroom and left again. After leaving for the second time, she received a text message from Roberson that said, "'There's nothing you need to say no more since you chose. Fuck you. You fake as fuck, and it took everything in me to not fuck up your night, so if I were you, I would leave since I'm not shit to you.'"

Jandreau told the jury that, while sitting in her car with Funk, she saw Roberson walk out of the bar and to his car. He returned and stood about five feet in front of her car, holding a gun. Roberson approached the passenger side of the vehicle and tried to open the door where Funk was sitting. Jandreau began driving off and then heard a gunshot.

Jandreau did not know what to do and drove away without a specific destination in mind. She told the jury, "And then my low tire pressure sign had come on, and so that's when I had known that there was at least something in my tire." While driving, Jandreau received a call from Roberson, who said she was going to be dead if he ever saw her in public again. She called 911 and eventually met two officers at the police station. Jandreau testified she provided a statement to police, and the officers helped Funk change the back tire.

3

On cross-examination, Jandreau explained that she never told Roberson where she was going, but she only goes to one bar in town. She sat in her car with Funk and another friend for about five minutes before going back in to use the bathroom. Jandreau said that she could feel the back right tire deflating as she drove away. The tire pressure light came on "[m]aybe a minute after . . . the incident had occurred." And Jandreau explained that all her tires were brand new.

Funk also testified. He was acquainted with Roberson and had had friendly conversations with Roberson, but they were not friends. Funk left the bar with Jandreau and went to her parked car. They sat in the car talking for a while before she returned to the bar to use the restroom. When Roberson approached Jandreau's vehicle, Funk saw the gun in Roberson's hand. Funk testified that, after Jandreau began to drive away, Roberson "basically stepped back, got out of the way a little bit, and that's when he raised his arm, his right arm that held the gun, and he fired one single shot at the car." Funk heard and saw the shot. The State admitted screenshots of text messages Funk received from Roberson after he left with Jandreau. In the text messages, Roberson threatened Funk repeatedly.

Funk testified he saw the damage to Jandreau's tire, which looked like a puncture hole in the tire. He explained that the car had "immediately alerted us that the tire pressure had gone down to, I believe, 20 PSI." Funk changed the tire at the police station.

Megan Forbes testified next. She was the bartender at The Dive on the night of the altercation. She testified that Roberson seemed angry. Roberson asked her, "'Can you believe this?'" regarding "[Jandreau] being there with someone else." Roberson talked to Forbes about being agitated by it "a couple more times" throughout the night, and Roberson was "clearly not happy." Forbes testified she heard a single gunshot after she locked up The Dive for the night.

4

Cole Brummer, an officer with the Leavenworth Police Department, testified he spoke with Jandreau in the police department parking lot the night of the incident. He observed damage to Jandreau's vehicle and told the jury, "The back passenger side tire had a bullet hole in it." He further explained, "There was a hole in the tread exposing the wire to the tread, consistent with being struck . . . with an object." Although the tire had low pressure when he first saw the tire, it was completely flat within 20 to 30 minutes.

After taking Jandreau's and Funk's statements, Brummer went to the area near where Jandreau had been parked outside The Dive and began searching for evidence. Brummer found "a bullet fragment or a slug, a spent slug." The slug was "towards the rear passenger side tire, like where a car would've been parked." In addition, Brummer noticed that the road looked different, telling the jury, "You could see where something had impacted the road, and it had discolored or changed the color of the road." Although he did not see how the tire was punctured, based on his training and experience, Brummer believed the tire had been struck by a bullet. Brummer admitted he did not find a bullet or slug inside the tire.

Laura Flynn, a detective with the Leavenworth Police Department, testified next. She investigated the case by obtaining and reviewing videos from nearby security cameras, and she saw Jandreau's tire. Based on her crime scene investigation training involving firearms, she believed the damage to the tire was consistent with a bullet impact.

The jury convicted Roberson of all counts. The jury also found the convictions for criminal threat and aggravated assault against Jandreau were acts of domestic violence.

Three months later, at the sentencing hearing, after hearing the parties' recommendations, the district court began to sentence Roberson, stating, "For the crime of aggravated assault, a severity level 7 person felony, with a criminal history score of H,

the Court will impose the standard sentence of 13 months with the Kansas Department of Corrections." The district court noted that a special rule applied, making the sentence presumptive prison, and denied Roberson's request not to apply the special rule. The district court advised Roberson that the offense required registration as a violent offender.

The district court continued, "On Count Two, for the crime of aggravated assault, a severity level 7 person felony, with a criminal history score of I, the Court will impose the standard sentence, which is 12 months with the Kansas Department of Corrections." Again, the district court applied the special rule, making the sentence presumptive prison, and informed Roberson of his duty to register. The district court stated it was "going to run this sentence consecutively, not concurrently, with the sentence in Count One."

As the district court began to pronounce the sentence for Count 3, the prosecutor interrupted and informed the district court that Count 2 was the primary offense, the sentence the district court had just pronounced was for Count 3, and the district court had not yet pronounced a sentence for Count 1. The order of the crimes listed in the presentence investigation report did not match the order in the charging document.

The district court acknowledged the prosecutor and stated:

> "So the . . . first sentence was actually Count Two, and—and this is the sentence on Count Three, which is also aggravated assault, a severity level 7 person felony. With the special rule, the se—the Court is sentencing the defendant [to] 12 months with Kansas Department of Corrections, subject to the possibility of 20 percent good time credit.
> "As I stated, the Court is running these two counts consecutively, not concurrently, with one another. Counts Two and Three are to run consecutively. Postrelease supervision is 12 months."

6

The district court then sentenced Roberson on Counts 1, 4, 5, and 6. The district court ran those sentences concurrent with the sentences in Counts 2 and 3. However, the district court's amended journal entry of sentencing erroneously indicates Count 1 is to run consecutive to Count 2 instead of concurrent.

Roberson timely appealed.

ANALYSIS

I. *There Was Sufficient Evidence to Support the Jury's Findings*

On appeal, Roberson raises two sufficiency of the evidence arguments. First, Roberson argues that there was insufficient evidence for a jury to find that Roberson and one of the victims, Jandreau, had been in a dating relationship. As a result, he contends there was insufficient evidence that the crimes of aggravated assault and criminal threat were domestic violence offenses. Then, Roberson challenges the sufficiency of the evidence to prove criminal damage to Jandreau's property.

*Standard of Review*

"When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024).

A. *There was sufficient evidence for a rational fact-finder to find the crimes of aggravated assault and criminal threat were domestic violence offenses.*

K.S.A. 21-5111(j) defines a "'[d]omestic violence offense'" as "any crime committed whereby the underlying factual basis includes an act of domestic violence." Under K.S.A. 21-5111(i), "'[d]omestic violence'" is defined as, in relevant part, "an act or threatened act of violence against a person with whom the offender is involved or has been involved in a dating relationship."

K.S.A. 21-5111(i)(1) defines a "'[d]ating relationship'" as "a social relationship of a romantic nature." In determining whether a dating relationship exists or existed, a jury may consider the "[n]ature of the relationship, length of time the relationship existed, frequency of interaction between the parties and time since termination of the relationship, if applicable." K.S.A. 21-5111(i)(1).

Roberson argues that the State's evidence was insufficient to prove a dating relationship between Jandreau and him. He contends that there was no actual evidence of a "'social relationship of a romantic nature'" because the relationship was, at best, one-sided. Roberson does not argue there was insufficient evidence supporting his convictions; he only argues the facts do not sufficiently support the domestic violence offense designations. He has abandoned any argument that his conviction was erroneous. See *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020) (issue not raised deemed abandoned and failure to support point with authority is like failing to brief issue).

The State contends there was sufficient evidence from which a jury could determine that Roberson and Jandreau had been in a dating relationship. It emphasizes the sexual relationship between the parties and argues Roberson was upset Jandreau was with another man, highlighting Roberson's romantic interest.

8

The State asserts that this case is like *State v. Gabler*, No. 127,885, 2025 WL 3251026 (Kan. App. 2025) (unpublished opinion). There, the victim testified that she and Gabler were in a romantic relationship from 2019 until 2021. But the victim did not explain what she meant by "romantic relationship." 2025 WL 3251026, at *1. The jury found Gabler guilty of domestic battery and criminal damage to property and found the offenses were domestic violence offenses. Gabler appealed.

On appeal, the panel concluded the jury could have found a romantic relationship because "[the victim] used that exact term, that the relationship was long-term because it lasted for two years, and that the relationship was recent to the offenses." 2025 WL 3251026, at *4. Because "three of the four statutorily enumerated factors swung in favor of finding a dating relationship had existed," the panel found sufficient evidence supported the jury's finding that the crimes constituted domestic violence offenses. 2025 WL 3251026, at *4.

Despite the State's suggestion to the contrary, the facts here are easily distinguishable from *Gabler*. But, although *Gabler* is distinguishable, reversal is not required. The list of factors in K.S.A. 21-5111(i)(1) to consider in determining whether a dating relationship exists is nonexhaustive. And the statute does not define the parameters of the statutorily enumerated factors. Instead, it simply states:

> "In addition to any other factors the court deems relevant, the trier of fact may consider the following when making a determination of whether a relationship exists or existed: Nature of the relationship, length of time the relationship existed, frequency of interaction between the parties and time since termination of the relationship, if applicable." K.S.A. 21-5111(i)(1).

9

Here, Jandreau described the relationship between her and Roberson as sexual, not "romantic" in nature, and indicated they had only been together sexually three or four times before ending the relationship. But Jandreau explained that they "had only been friends again for about a month prior to the incident and it [had been] a little rocky." Jandreau also testified she communicated with Roberson via FaceTime, phone calls, and text messages. Forbes testified Roberson "seem[ed] angry" that Jandreau was there with another guy." From The Dive bar, Roberson sent Jandreau a text message saying, "There's nothing you need to say no more since *you chose*." (Emphasis added.) And Roberson sent Funk—the man he perceived Jandreau "chose" to be with—10 text messages threatening his life.

Roberson essentially asks this court to reweigh the evidence, something we cannot do. See *Mendez*, 319 Kan. at 723. When the evidence is viewed in the light most favorable to the State, a rational fact-finder could have found, beyond a reasonable doubt, that Roberson and Jandreau either were, or had been, engaged in a "social relationship of a romantic nature" based on their previous sexual relationship; attempts to renew their friendly, but rocky relationship; and Roberson's apparent jealousy. Roberson is not entitled to relief.

We note, however, that the district court's journal entry of sentencing failed to designate Count 4, criminal threat, as a domestic violence offense. Because the jury found Count 4 was a crime of domestic violence, we remand for a nunc pro tunc order correcting the journal entry of sentencing to accurately reflect the jury's finding.

B.    *There is sufficient evidence supporting Roberson's conviction for criminal damage to property.*

On appeal, Roberson argues that, under K.S.A. 21-5813(a)(1), the State was required to prove Roberson "knowingly damaged, destroyed, defaced, or substantially

10

impaired [Jandreau's] use of the car tire without her consent, and the damage was less than $1,000." He asserts that there are "holes in the State's theory of prosecution." Specifically, he claims "there was a significant question as to whether a bullet hit the tire at all." He contends that "[t]he evidence shows only that any alleged bullet hit the ground, causing debris to fly into the air and some damage to the asphalt."

The State counters that there was sufficient evidence to show "that the tire was damaged by the bullet fired from [Roberson's] gun." It suggests Roberson is simply attempting to relitigate the trial evidence.

Roberson correctly points out that there was no bullet found inside the tire. And he correctly notes that Brummer did not know when the bullet found near where Jandreau's car had been parked had been shot. Similarly, the law enforcement officers' testimony explaining the likely cause of damage to the tire differed regarding potential bullet entry and exit trajectories. Roberson concludes that "there was insufficient evidence that [Roberson] fired a bullet which hit [Jandreau's] tire."

Despite these arguments, Roberson is not entitled to relief. To prove criminal damage to property, the State must show that the defendant is guilty of, "by means other than by fire or explosive: (1) Knowingly damaging, destroying, defacing or substantially impairing the use of any property in which another has an interest without the consent of such other person." K.S.A. 21-5813(a)(1).

Circumstantial evidence can support a conviction of even the greatest offense if the evidence allows a fact-finder to find the elements beyond a reasonable doubt. To sufficiently support the conviction, "circumstantial evidence does not need to exclude every other reasonable conclusion . . . ." *State v. Barnes*, 320 Kan. 147, 177-78, 563 P.3d 1255 (2025); see also *State v. Valdez*, 316 Kan. 1, 12, 512 P.3d 1125 (2022) (circumstances used to infer guilt must be proved and cannot be inferred or presumed

11

from other circumstances). There is no legal distinction between direct and circumstantial evidence in terms of its respective probative value. *State v. Kemmerly*, 319 Kan. 91, 102, 552 P.3d 1244 (2024).

There was sufficient circumstantial evidence for a rational fact-finder to find that Roberson criminally damaged Jandreau's tire. Both Jandreau and Funk testified Roberson pointed a gun at Jandreau's vehicle, and both heard a gunshot. Funk testified he saw Roberson shoot at the vehicle. Jandreau testified that all her tires were brand new and had not been damaged before that night. Jandreau explained that her tire pressure warning light came on "maybe a minute after . . . the incident had occurred" and she could feel the tire deflating as she drove away. Brummer testified he found "a bullet fragment or a slug, a spent slug" near where Jandreau had been parked. This evidence, while circumstantial, is sufficient for a rational fact-finder to conclude Roberson knowingly damaged Jandreau's tire.

II.     *The Journal Entry of Sentencing Must Be Corrected*

*Standard of Review*

Whether a sentence is illegal is a question of law over which appellate courts exercise unlimited review. See *State v. Daniels*, 319 Kan. 340, 342, 554 P.3d 629 (2024).

*Discussion*

Roberson suggests the district court sentenced him to 12 months in prison on Count 2, and the amended journal entry of sentencing incorrectly reflects a 13-month sentence. The State argues the district court initially sentenced Roberson to 12 months' imprisonment for Count 2 based on confusion with the numbered counts. It asserts the district court then "clarified that the 13-month sentence was for count two and the 12-

12

month sentence was for count three." The State contends the district court's amended journal entry of sentencing accurately reflects the district court's oral pronouncement of the total months to be served.

"A sentence is effective when pronounced from the bench." *State v. Johnson*, 320 Kan. 246, 248, 564 P.3d 782 (2025). A judge's oral pronouncement of sentence controls over a conflicting written journal entry, which creates "a clerical error that may be corrected at any time." *State v. Edwards*, 309 Kan. 830, 835-36, 440 P.3d 557 (2019). "Once a district court sentences a defendant, it loses jurisdiction to modify that sentence unless it is illegal or 'to correct arithmetic or clerical errors.'" *State v. Lamia-Beck*, 318 Kan. 884, 886, 549 P.3d 1103 (2024). But a district court is not "precluded from correcting or clarifying a sentence at the same hearing after misspeaking or miscalculating." *State v. D.W.*, 318 Kan. 575, 581, 545 P.3d 26 (2024).

Here, the district court corrected and clarified its sentence part-way through pronouncing the sentence. First, the district court pronounced the sentence for the primary offense, stating, "For the crime of aggravated assault, a severity level 7 person felony, with a criminal history score of H, the Court will impose the standard sentence of 13 months with the Kansas Department of Corrections." After addressing the special rule that applied to make the sentence presumptive prison, postrelease supervision, and violent offender registration, the district court continued:  "On Count Two, for the crime of aggravated assault, a severity level 7 person felony, with a criminal history score of I, the court will impose the standard sentence, which is 12 months with the Kansas Department of Corrections." Again, the district court addressed the special rule, postrelease supervision, and registration requirements. It began to address Count 3 before the prosecutor interrupted. The prosecutor informed the district court that Count 2 was the primary offense, the sentence the district court had just pronounced was for Count 3, and the district court had not yet pronounced a sentence for Count 1.

13

After acknowledging the mistake, the district court continued:

"So the . . . first sentence was actually Count Two, and—and this is the sentence on Count Three, which is also aggravated assault, a severity level 7 person felony. With the special rule, the se—the Court is sentencing the defendant [to] 12 months with [the] Kansas Department of Corrections, subject to the possibility of 20 percent good time credit."

The district court then sentenced Roberson on Counts 1, 4, 5, and 6.

From this context, the district court intended to pronounce a 13-month prison sentence—the standard sentence in a nondrug severity level 7 felony for an individual with a criminal history score of H—for the primary offense of one count of aggravated assault, and the standard 12-month prison sentence for the other count of aggravated assault. See K.S.A. 21-6804(a). The presentence investigation report also supports this interpretation as it shows Count 2 as the primary count and lists it first. Count 3 is listed as the first additional offense, and Counts 1, 4, 5, and 6 follow.

After misspeaking, the district court clarified its intentions and corrected its sentence to correspond to the correct counts. We note that, although the amended journal entry of sentencing does reflect the correct sentence length for Count 2 and the correct total months overall, the Presumptive Sentencing Range for Count 2 erroneously shows the range as Aggravated 13, Standard 12, and Mitigated 11. When correcting the journal entry, this error should also be corrected.

Finally, Roberson argues the journal entry of sentencing must be amended to reflect that the district court ordered the sentence in Count 1 to run concurrent with the sentence in Count 2. The State concedes that the journal entry must be corrected. The district court ordered Roberson's sentence in Count 1 to run concurrent with Counts 2 and 3. The journal entry of sentencing must be corrected to accurately reflect the district

14

court's sentence, which may be done by a nunc pro tunc order. See *Edwards*, 309 Kan. at 835-36.

Affirmed and remanded with directions.